Filed 10/16/13  P. v. Legler CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY JAMES LEGLER,<br><br>    Defendant and Appellant. | H038441, H038798<br>(Santa Clara County<br>Super. Ct. No. C1109100) |
| In re ANTHONY JAMES LEGLER,<br><br>    on Habeas Corpus. | H039776 |

Defendant Anthony James Legler was found guilty by a jury of one count of committing a lewd or lascivious act on a child under 14 years of age (Pen. Code, § 288, subd. (a))[1] and not guilty of one count of committing a lewd or lascivious act on a child who was 14 or 15 years old (*id*., subd. (c)(1)).  The trial court suspended imposition of sentence and placed Legler on three years' formal probation, including a one year county jail term.  He was awarded 87 days of custody credits and 42 days of conduct credits under section 4019.

On appeal from the judgment of conviction (H038441), Legler raises several arguments:  (1) the jury was given an ambiguous jury instruction, CALCRIM No. 3425,

---

[1] Further unspecified statutory references are to the Penal Code.

relating to the defense of legal unconsciousness, which operated to preclude the jury from considering evidence of his unconsciousness thus violating his due process rights; (2) his trial counsel was ineffective for failing to object to the prosecutor's repeated references to facts not in evidence during closing argument; and (3) the cumulative effect of these two errors mandates reversal.[2]

Legler separately appeals from an order denying his postsentencing motion to recalculate his presentence conduct credits (H038798). We granted Legler's motion to have both appeals considered together for purposes of briefing, oral argument and decision.

In addition, Legler has filed a petition for writ of habeas corpus (H039776), which we have ordered to be considered in connection with the appeals. In that petition, Legler contends his trial counsel was ineffective for failing to call an expert witness in psychology to testify that his "nature is not consonant with child molestation" and for failing to retain an expert on sleep disorders to explain that the alleged act of molestation could have been committed while Legler was asleep. In addition, Legler contends his due process rights were violated by this court denying his request for funds to retain a sleep disorders expert for purposes of his petition for writ of habeas corpus.

We disagree with all of Legler's arguments on appeal and shall affirm both the judgment and the order denying him additional conduct credits.

We further conclude that Legler fails to make a prima facie showing sufficient to warrant habeas relief due to ineffective assistance of counsel and shall deny the petition.

---

[2] In his opening brief, Legler also challenged a criminal justice administration fee imposed by the trial court, but he conceded in his reply that this argument was forfeited based on his failure to raise it below, as explained by the California Supreme Court's recent decision in *People v. McCullough* (2013) 56 Cal.4th 589. We agree the concession is appropriate and do not address the issue further.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

At the time of the offense, Legler was married.  He had two children with his wife (hereafter sometimes "the mother"), and was stepfather to two girls his wife had from a prior relationship.  The two stepdaughters were 14 (older stepdaughter) and 12 (younger stepdaughter).  Legler, his wife and the four children lived together in a townhome in San Jose.

On the evening of June 1, 2011, Legler and the rest of the family[3] were watching television together in the living room.  Legler and the younger stepdaughter were sitting next to each other on one couch, while the mother was lying on a different couch and the older stepdaughter was sitting in a chair.

The younger stepdaughter testified she was sitting on the couch with her feet on an ottoman, while Legler sat next to her, close enough so that their sides were touching.  She said she did not have a blanket covering her, and she asked Legler to rub her back and her stomach as it helped her to fall asleep.  As Legler was rubbing her stomach, she was "half asleep," and was not sure whether Legler was asleep or awake.  Legler's hand was rubbing her stomach underneath her shirt, but his hand eventually moved lower.  Eventually, she felt his hand beneath her shorts and underwear, both of which had elastic waistbands.  She was surprised by this and felt uncomfortable.  She said he rubbed her vagina for approximately 10 seconds.  Legler did not say anything as he touched her, and then he got up and went outside to smoke.  The younger stepdaughter ran upstairs to her room.

The mother testified she was asleep on the couch that evening and did not see Legler touching the younger stepdaughter.  She woke up as she saw Legler and the

_____

[3] The older stepdaughter and the mother believed the two younger children were also in the room, though Legler's wife was not certain where they were specifically.  The older stepdaughter testified they were sitting on one of the couches, but were both asleep.

younger stepdaughter get up off the couch at the same time. She said Legler appeared groggy as he walked to the bathroom, while the younger stepdaughter ran upstairs to her room.

The older stepdaughter testified she was awake and sitting on one of the sofas that evening. She saw Legler was initially awake, but later heard him "kind of snoring" and he appeared to be "dozing off." At the same time, she saw his hand was on the younger stepdaughter's stomach. She did not see him touch any other part of the younger stepdaughter's body, but she saw his hand move lower. She did not see Legler touch the younger stepdaughter's vagina, but she believed her sister was covered by a blanket so she could not see Legler's hand.

The following morning, the mother went upstairs and woke up the younger stepdaughter to go to school. She did not appear upset and she did not say anything about Legler touching her vagina. After school, the mother picked up the younger stepdaughter and, as they were driving home, the girl asked her mother what she would do if one of her friends had been touched inappropriately by a parent. The mother turned the car around to go report the incident to someone at the school. Before they reached the school, however, the younger stepdaughter explained that she asked the question because Legler had touched her vagina the night before. The mother drove back to their home and called the San Jose Police Department.

Legler was not at home, so the officers who responded to the mother's call asked her to participate in a pretext phone call with him. During that phone call, Legler told his wife he was "half asleep" and was rubbing the younger stepdaughter's stomach. When he suddenly realized his hand was touching her pubic hair, he pulled away. He said he did not remember touching her vagina.

Later that same day, Legler was interviewed by San Jose Police Detective Tam Truong. After being apprised of his *Miranda*[4] rights, Legler told Truong he was "half asleep" when the incident occurred, but his hand must have slipped inside the younger daughter's shorts and panties. When he realized he was touching the "top" of her pubic hair, he moved his hand away. Legler reiterated several times that he did not consciously put his hand underneath the younger stepdaughter's underwear or near her vagina.

Legler testified in his own defense. He said he fell asleep while rubbing the younger stepdaughter's stomach. When he awoke, his hand was inside her panties and he felt pubic hair under his fingertips. He did not remember moving his hand there and believed the total amount of time he was in contact with her pubic hair was less than 10 seconds. He moved his hand and got up.

Dr. Kasey Li testified as a character witness on Legler's behalf. Dr. Li, a surgeon at Stanford Hospital, has worked with Legler, a surgical technician, for eight to 10 years. He believed Legler is a person of good moral character and someone who is not "given to lewd conduct with children."

The jury convicted Legler of one count of committing a lewd or lascivious act on a child under 14 years of age (§ 288, subd. (a)).[5] The trial court suspended imposition of sentence and placed Legler on formal probation for three years, including one year in county jail. He was awarded presentence credits totaling 129 days, consisting of 87 days of custody credit and 42 days of conduct credits. Along with various other fines and fees,

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

[5] Legler was acquitted on one count of committing a lewd or lascivious act on a child who was 14 or 15 years old (§ 288, subd. (c)(1)), stemming from an incident involving the older stepdaughter a few days before the incident with the younger stepdaughter. Because Legler was found not guilty of that offense, we do not recount the evidence offered at trial in relation to that charge.

Legler was ordered to pay a $129.75 criminal justice administrative fee to the City of San Jose. Legler timely appealed from the judgment (H038441).

After sentencing, Legler filed a motion in the trial court to correct his presentence conduct credits and to recalculate his release date, arguing that he was entitled to additional credits under the version of section 4019 in effect at the time of his sentencing hearing. The trial court, relying on *People v. Ellis* (2012) 207 Cal.App.4th 1546, denied the motion, and Legler has separately appealed that order (H038798).

We granted Legler's motion to consolidate the two appeals for purposes of briefing, oral argument and decision.

## II.   DISCUSSION

### A.   *CALCRIM No. 3425*

#### 1.   *Relevant facts and jury instructions*

Legler's defense was that he touched the younger stepdaughter while he was asleep and that he was therefore legally unconscious. His version of the incident was mostly consistent throughout his pretrial statements as well as his testimony at trial. Essentially, Legler said he did not remember placing his hand on or near the younger stepdaughter's vagina, and when he realized his hand had slipped and was touching her pubic hair, he moved it. The younger stepdaughter was not aware if Legler was asleep, but his wife stated that he appeared groggy when he got up from the couch, and the older stepdaughter testified that Legler was "kind of snoring" and was "dozing off" when the incident occurred.

In light of this evidence, the trial court instructed the jury on legal unconsciousness with the following tailored version of CALCRIM No. 3425: "The defendant is not guilty of committing lewd and lascivious conduct if he acted while legally unconscious. Someone is legally unconscious when he is not conscious of his actions. Someone may be unconscious even though able to move. Unconsciousness may be caused by a blackout, sleep walking or a similar condition. The People must prove

6

beyond a reasonable doubt that the defendant was conscious when he acted. [¶] If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious you should conclude that he was conscious. [¶] If, however, based on all the evidence you have a reasonable doubt that he was conscious you must find him not guilty."

Before instructing on unconsciousness, however, the trial court instructed the jury the People had to prove "the union or joint operation of act and wrongful intent[, and] . . . [f]or you to find a person guilty of committing a lewd and lascivious act that person must not only intentionally commit the prohibited act but must do so with a specific intent."

The trial court then instructed the jury on the law relating to the charged offense of committing a lewd or lascivious act on a child under 14 years of age. In those instructions, the court indicated the People "must prove that, one, the defendant willfully touched any part of a child's body either on the bare skin or through the clothing. [¶] Two, the defendant committed the act with the intent--intent of arousing, appealing to or gratifying the lust, passions or sexual desires of himself or the child. . . . [¶] . . . [¶] Someone commits an act willfully when he does it willingly or on purpose."

### 2.    *Standard of review*

In deciding whether instructional error occurred, we "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Mills* (1991) 1 Cal.App.4th 898, 918.) In that context, we then "determine whether it is reasonably likely the jurors understood the instruction[s] as [defendant] suggests. [Citation.] In making that determination, we must consider several factors including the language of the instruction[s] in question [citation], the record of the trial [citation], and the arguments of counsel." (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.) "[T]he case law is clear that whether the giving of a concrete instruction is confusing or erroneous must be determined from the instructions as a whole. . . . 'Error cannot be predicated upon an isolated phrase, sentence or excerpt from the instructions since the correctness of an instruction is to be determined in its relation to other

7

instructions and in the light of the instructions as a whole. [Citations.] Accordingly, whether a jury has been correctly instructed is not to be determined from a part of an instruction or one particular instruction, but from the entire charge of the court.' " (*People v. Patterson* (1979) 88 Cal.App.3d 742, 753.) Even if we conclude that " 'a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' " (*People v. Hernandez* (2003) 111 Cal.App.4th 582, 589.)

Errors in jury instructions are reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman* (1998) 19 Cal.4th 142, 172-178.) Therefore, an error requires reversal only where "an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Id.* at p. 165, citing *People v. Watson*, *supra*, at p. 836 & Cal. Const., art. VI, § 13.)

"As Chief Justice Rehnquist has observed: 'Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.' " (*People v. Williams* (1995) 40 Cal.App.4th 446, 457.)

> 3. *The totality of the instructions cured any ambiguity in*
> *CALCRIM No. 3425*

One who commits a criminal act when he is unconscious is not criminally responsible. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417; § 26.) "To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' " (*People v. Halvorsen*, *supra*, at p. 417.) However, consciousness itself is not an element of this, or any other, offense. (*People v. Babbitt* (1988) 45 Cal.3d 660, 693-694.)

Relying on *People v. Mathson* (2012) 210 Cal.App.4th 1297 (*Mathson*), Legler contends that the portion of the instruction which states " '[i]f there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was legally conscious,' " (*id.* at p. 1322) was misleading in the sense that the jury could conclude he was conscious merely because he acted as if he were conscious.

*Mathson* considered CALCRIM No. 3425 in the light of its predecessors (the various revisions of former CALJIC No. 4.31), the last of which was upheld by the California Supreme Court in *People v. Babbitt*, *supra*, 45 Cal.3d 660. Despite finding that CALCRIM No. 3425 was, in some ways, an improvement over prior versions of the legal unconsciousness instruction, the court ultimately found it ambiguous, because it appears to direct the jury to unqualifiedly conclude the defendant is conscious if he *acts* as if he were conscious. (*Mathson*, *supra*, 210 Cal.App.4th at p. 1323.) The next sentence of the instruction, which begins, " 'If, however,' " does not sufficiently explain that the jury is allowed to entertain a reasonable doubt regarding defendant's consciousness in spite of the defendant acting as if he were conscious. (*Ibid.*) "In context, [the second sentence] could mean that the jury is only to consider whether there is reasonable doubt based on the other evidence if it finds that a defendant acted as if he was not conscious." (*Ibid.*)

Even assuming, however, that the instruction was ambiguous, any such ambiguity was resolved by the remaining instructions given to the jury in this case. The instruction on lewd and lascivious conduct advised the jury that Legler's culpability was contingent upon a willful act carried out with specific intent. Legler did not dispute touching the younger stepdaughter; rather, the only[6] dispute was whether he did so while conscious or

---

[6] There was also some conflicting testimony about whether Legler touched the younger stepdaughter's vagina or merely her pubic hair, but that is not at issue in this appeal.

unconscious. As instructed, the jury could only convict him if it found he acted willfully and with the specific intent "of arousing, appealing to, or gratifying the lust, passions or sexual desires of himself or the child." It could not convict him simply because he acted as if he were conscious.

Legler's attempt to analogize this case to *Carella v. California* (1989) 491 U.S. 263 is unsuccessful. In that case, the trial court instructed the jury a person " 'shall be presumed to have embezzled' a vehicle if it is not returned within 5 days of the expiration of the rental agreement; and second, that 'intent to commit theft by fraud is presumed' from failure to return rented property within 20 days of demand." (*Id*. at p. 265.) The Supreme Court held that these instructions violated the defendant's due process rights because they imposed mandatory presumptions, which "directly foreclosed independent jury consideration of whether the facts proved established certain elements of the offenses with which Carella was charged." (*Id*. at p. 266.)

The instruction in this case did not create a mandatory presumption as to an element of the offense, such as intent. The trial court separately and correctly instructed the jury regarding the offense of lewd and lascivious conduct, and there is nothing in those instructions which creates a presumption, mandatory or otherwise, that Legler acted willfully or with specific intent simply because he was conscious.

The instructions, read as a whole, informed the jury that the People had the burden of proving the intent element of the offense beyond a reasonable doubt, and nothing in CALCRIM No. 3425 prevented the jury from considering the evidence that Legler was dozing off while rubbing the younger stepdaughter's stomach, and pulled his hand away when he became conscious he was touching her pubic hair. Merely because the jury disbelieved Legler's testimony on this issue does not mean that they were improperly instructed on the defense of legal unconsciousness.

10

B.    *Ineffective assistance of counsel for failing to object to prosecutor's argument*

1.    *Relevant facts*

Midway through her opening argument, the prosecutor explained: "If there's anyone here who's ever played poker you might be familiar with the phrase a tell, t-e-l-l. [¶] And what a 'tell' is, and I'm not a good poker player so I hope I can describe it accurately. . . . What a tell is, is when a person is doing something, is giving some signal unconsciously that other people are reading and they are telling--and they are telling the other people there something they don't want them to know. [¶] An example of this would be let's say every time I play poker and I have a really good hand I start biting my bottom lip. So I'm looking at my cards, I'm going like this, (indicating), because I've got a full house or a pair of aces or something like that. [¶] I don't realize I am doing it. I don't know I am biting my bottom lip like that but all the other players at the table have picked up on my tell and when they see me biting my bottom lip they know to fold because they are going to lose their money."

The prosecutor then said that Legler "has a 'tell' when he is being deceptive. [¶] And . . . what his tell is, when he's lying, and this happened over and over in his conversation with Detective Truong and also it happened when he was on the stand, when he is confronted with something and he is being deceptive, he is telling a lie he says the same phrase. You know, y-o-u-k-n-o-w, you know. [¶] And he especially goes back on that phrase whenever he's questioned about being asleep when he was touching [the younger stepdaughter]." The prosecutor then identified at least 10 answers to questions in which Legler used the phrase "you know" and claimed that he was lying in each of those answers. There was no objection by Legler's trial counsel throughout the course of this argument.

During Legler's closing argument, his counsel briefly addressed this portion of the prosecution's argument as follows: "Now, I think--and I'm not one to throw out a lot of

big words but a 'you know' can be something other than a lie, obviously. And it can be what's called an idiomatic phrase. [¶] It can be a lot of different things in grammar. [¶] And to make the responses of repeated 'you knows' for somebody who is being interrogated by police, somebody who is on a pretext call or somebody who just uses 'you know' to mock, to jibe, to say, hey, let's laugh about. It might be a system for Vegas but it is not a system for your fact finding process. And I am glad to say that, not so enamored with my particular profession at times, but what we say is not evidence. [¶] And a trite pop psychology analysis of, you know, you know, you know, you know, is not something that you should consider."

### 2. *Standard of review*

"To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1058; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-696.) 'When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of representation provided by counsel. "If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' [citation], the contention must be rejected." ' " (*People v. Samayoa* (1997) 15 Cal.4th 795, 845.)

Legler bears a burden that is difficult to carry on direct appeal. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) Our review of a claim of ineffective assistance of counsel is highly deferential; we must make every effort to avoid the distorting effects of hindsight and to evaluate the challenged conduct from counsel's perspective at the time. (*In re*

*Jones* (1996) 13 Cal.4th 552, 561; *Strickland v. Washington*, *supra*, 466 U.S. at p. 689.) A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. (*Strickland v. Washington*, *supra*, at p. 689; *People v. Hart* (1999) 20 Cal.4th 546.) As to the failure to object in particular, "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)

As to the prejudice prong, "[t]he United States Supreme Court [has] explained that this second prong of the *Strickland* test is not solely one of outcome determination. Instead, the question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' " (*In re Harris* (1993) 5 Cal.4th 813, 833.) A defendant must prove prejudice that is a " 'demonstrable reality,' not simply speculation." (*People v. Williams* (1988) 44 Cal.3d 883, 937; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

### 3. *Trial counsel was not ineffective for failing to object to the prosecutor's opening argument*

Legler contends the prosecutor effectively served as her own expert witness during opening argument when she claimed his repeated use of the phrase "you know" while answering questions proved that he was lying. The prosecutor did not state how she knew the use of "you know" constituted a "tell," and she did not provide any evidence from trial that proved Legler was lying in any of the numerous answers that she cited. Accordingly, the prosecutor argued facts not in evidence by engaging in quasi-psychological analysis of Legler that was wholly unsupported by any evidence admitted at trial.

A prosecutor commits misconduct if he or she argues facts not in evidence during closing argument. (*People v. Bolton* (1979) 23 Cal.3d 208, 212-214.) Although the prosecutor may not argue matters outside the record, he may argue inferences from the

13

evidence, or matters that are drawn from common experience, history or literature. (*People v. Williams* (1997) 16 Cal.4th 153, 221.)

As the California Supreme Court explained in *People v. Hill* (1998) 17 Cal.4th 800, it is misconduct for a prosecutor to argue facts not in evidence "because such statements 'tend[] to make the prosecutor his own witness--offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence." [Citations.]' [Citations.] 'Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal.' " (*Id.* at p. 828.)

However, with that prohibition in mind, a prosecutor is entitled to wide latitude during argument. (*People v. Williams*, *supra*, 16 Cal.4th at p. 221.) " ' "The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation.] "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness." ' " ' " (*Ibid.*)

Consequently, the line is drawn between improper argument--argument based on facts not in evidence--and proper argument--argument premised on reasonable inferences or drawn from common knowledge or experiences. We think the prosecutor's argument in this case fell on the side of proper argument. Legler's statements to the police, including each and every "you know," were part of the record. The prosecutor was merely arguing an inference from the record, as she is permitted to do. (*People v. Rowland* (1992) 4 Cal.4th 238, 277.)

Legler's argument that the prosecutor was portraying herself as a quasi-expert in psychology is not reasonable, nor was the jury reasonably likely to believe she was

seeking to do so. The prosecutor utilized a term commonly used in the game of poker to imply that Legler was lying whenever he used the phrase "you know." She did not refer to psychological studies on deceptiveness and language during her argument. She did not even attempt to portray herself as an expert poker player, let alone one who is skilled in ferreting out tells in her opponents; rather, she admitted to being a "terrible poker player." Instead, her argument about "tells" and Legler's use of the phrase "you know," was simply a way of drawing on the jury's common knowledge or experience[7] in evaluating a person's credibility based on how that person responds to stress, such as being questioned about an uncomfortable subject.

Since the prosecutor's argument did not constitute misconduct, there was no basis for any objection by Legler's trial counsel and he could not be deemed ineffective for failing to object. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463 ["Representation does not become deficient for failing to make meritless objections."].)

C.     *Cumulative effect*

Because we have found neither instructional error nor ineffective assistance of counsel, Legler's claim of cumulative error fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

D.     *Section 4019 credits*

A criminal defendant is entitled to accrue both actual presentence custody credits under section 2900.5 and conduct credits under section 4019 for the period of incarceration prior to sentencing. Conduct credits may be earned under section 4019 by performing additional labor (§ 4019, subd. (b)) and by an inmate's good behavior. (*Id.* subd. (c).) In both instances, section 4019 credits are collectively referred to as conduct

---

[7] Presumably some or all of the jurors have, at some point in their lives, played poker or other games in which one's success relies, to a greater or lesser extent, on gauging the credibility of one's opponent(s).

credits.  (*People v. Dieck* (2009) 46 Cal.4th 934, 939, fn. 3.)  The court is charged with awarding such credits at sentencing.  (§ 2900.5, subd. (a).)

Before January 25, 2010, conduct credits under section 4019 could be accrued at the rate of two days for every four days of actual time served in presentence custody.  (Stats. 1982, ch. 1234, § 7, p. 4554 [former § 4019, subd. (f)].)  Effective January 25, 2010, the Legislature amended section 4019 in an extraordinary session to address the state's ongoing fiscal crisis.  Among other things, Senate Bill No. 3X 18 amended section 4019 such that defendants, with some exceptions, could accrue custody credits at the rate of two days for every two days actually served, twice the rate as before.

Effective September 28, 2010, section 4019 was amended again to restore the presentence conduct credit calculation that had been in effect prior to the January 2010 amendments, eliminating one-for-one credits.  By its express terms, the newly created section 4019, subdivision (g), declared the September 28, 2010 amendments applicable only to inmates confined for a crime committed on or after that date.  (Stats. 2010, ch. 426, § 2.)

Thereafter, the Legislature amended section 4019 yet again, reinstituting one-for-one conduct credits and making this change applicable to crimes committed on or after October 1, 2011, the operative date of the amendments.  (§ 4019, subds. (b), (c), & (h).)  Legler committed his crime on June 1, 2011, *before* the effective date of this particular amendment.

Legler contends that the language of section 4019, subdivision (h) in its current form is internally inconsistent, and to harmonize the conflicting language, the court should find that he is entitled to enhanced credits even though his crime was committed before October 1, 2011.  We disagree.

Section 4019, subdivision (h) states:  "The changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime

16

committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law."

The first sentence of section 4019, subdivision (h) is, on its face, clear and straightforward. The changes to the statute are to operate "prospectively," and the conduct credit amendment applies only to defendants whose crimes were committed "on or after October 1, 2011." (§ 4019, subd. (h).) Read in isolation, the first sentence leads directly to the conclusion Legler is not entitled to conduct credit at the enhanced rate because he committed his crime prior to October 1, 2011.

Admittedly, section 4019, subdivision (h)'s second sentence seems to confuse matters by directing that "days earned . . . prior to October 1, 2011, shall be calculated at the rate required by the prior law." Legler suggests that since no one who commits a crime *after* October 1, 2011, could ever be in custody *before* October 1, 2011, the "only logical" to implement the statute is to award enhanced credits to anyone in custody after its effective date, regardless of when they committed their crime.

Reading the sentence in the manner Legler suggests, however, renders the first sentence meaningless, as it would ignore the express direction that the amendment is to apply prospectively. This we cannot do. " ' "It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute." A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.' (2A Sutherland, Statutory Construction [(5th ed. 1992)] § 46.06, pp. 119-120, fns. omitted; [citations].)" (*Rodriguez v. Superior Court* (1993) 14 Cal.App.4th 1260, 1269 (*Rodriguez*).)

Rather, we must look to another well-established rule of statutory construction to guide our interpretation of subdivision (h). " 'A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each

17

part or section should be construed in connection with every other part or section so as to produce a harmonious whole.  Thus, it is not proper to confine interpretation to the one section to be construed.'  (2A Sutherland, Statutory Construction[, *supra*,] § 46.05, p. 103, fn. omitted.)"  (*Rodriguez, supra*, 14 Cal.App.4th at p. 1268.)

As discussed above, the first sentence reflects the Legislature's intent that the enhanced conduct credit provision apply only to those defendants who committed their crimes on or after October 1, 2011.  Section 4019, subdivision (h)'s second sentence, though certainly inartfully drafted, seems to be an attempt to clarify that those defendants who committed an offense before October 1, 2011, are to earn credit under the prior law. (*People v. Ellis*, *supra*, 207 Cal.App.4th at p. 1553; see also *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 52 [§ 4019, subd. (h) merely reaffirms that defendants who committed their crimes before Oct. 1, 2011, can still earn conduct credits, just under the prior law].)  We decline to ignore the Legislature's clear intent in the first sentence of section 4019, subdivision (h) by relying on an implied interpretation of the second sentence.

We think the explicit language of the statute is clear:  the 2011 amendment to section 4019 applies only to crimes that were "committed on or after October 1, 2011." (§ 4019, subd. (h).)  Having committed his crime before that operative date, Legler does not qualify for the credits available under the amended statute.  (*People v. Brown* (2012) 54 Cal.4th 314, 322, fn. 11; see *People v. Kennedy* (2012) 209 Cal.App.4th 385, 396-397 [reasoning in *Brown* applies to version § 4019 effective Oct. 1, 2011].)

### E.    Habeas petition

#### 1.    Ineffective assistance of counsel for not calling expert psychologist

##### a.    Relevant legal principles

"To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's

18

representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1058; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-696.)" (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 845.)

As we have already noted, our review of a claim of ineffective assistance of counsel is highly deferential; we must make every effort to avoid the distorting effects of hindsight and to evaluate the challenged conduct from counsel's perspective at the time. (*In re Jones*, *supra*, 13 Cal.4th at p. 561; *Strickland v. Washington*, *supra*, 466 U.S. at p. 689.) A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. (*Strickland v. Washington*, *supra*, at p. 689; *People v. Hart*, *supra*, 20 Cal.4th 546.)

Under the first prong of *Strickland*, the advocacy of counsel is deficient if it falls below an objective standard of reasonableness. (*Strickland*, *supra*, 466 U.S. at p. 688; see also *People v. Pope* (1979) 23 Cal.3d 412, 425, citing *In re Williams* (1969) 1 Cal.3d 168, 175.) "[I]t must also be shown that the omission was not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257, citing *People v. Frierson* (1979) 25 Cal.3d 142, 158.)

As to the prejudice prong, "[t]he United States Supreme Court [has] explained that this second prong of the *Strickland* test is not solely one of outcome determination. Instead, the question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' " (*In re Harris*, *supra*, 5 Cal.4th at p. 833.) A defendant must prove prejudice that is a " 'demonstrable reality,' not simply speculation." (*People v. Williams*, *supra*, 44 Cal.3d at p. 937; *People v. Fairbank*, *supra*, 16 Cal.4th at p. 1241.)

19

In connection with the right to effective representation, counsel has an obligation to carefully investigate and prepare all defenses of law and fact that can reasonably contribute to a defense. (*People v. Pope*, *supra*, 23 Cal.3d at p. 425.) The failure to investigate and utilize relevant expert witnesses can constitute ineffective assistance of counsel when testimony from an expert would promote the defense theory of the case. (*People v. Frierson*, *supra*, 25 Cal.3d at p. 166.)

### a. Relevant facts

Legler's first trial counsel, Richard Weese, had Legler undergo a psychological evaluation by Dr. John C. Brady II. Weese intended to use the evaluation: (1) to negotiate a better plea bargain; (2) as a potential mitigating factor for sentencing; or (3) as the basis for potential *Stoll*[8] expert testimony if the case went to trial. Dr. Brady's evaluation was intended to assess the following: Legler's nonsexual interests; his responses for faking, malingering, impression management and social desirability; the presence of cognitive distortions; and the presence of any signs of deviant sexual or abnormal sexual interests or paraphilic trends. Dr. Brady also employed various psychological tests to evaluate Legler's personality and compare it with identified sexual offenders, and administered three tests specific to sexual interest.

In his report, Dr. Brady concluded: (1) Legler was not lying or distorting during the evaluation; (2) Legler had no psychopathic personality components consistent with pedophilic offenders; (3) Legler did not indicate he has any deviant sexual interest; (4) Legler is able to control his impulses including those of a sexual nature; (5) Legler has not been diagnosed with pedophilia and is not otherwise a pedophilic offender; (6) Legler

---

[8] *People v. Stoll* (1989) 49 Cal.3d 1136. In *Stoll* the California Supreme Court held that a defendant charged with child molestation has the right to introduce expert testimony from a psychologist who evaluated him and determined that the defendant's character is not consistent with that of a typical child molester. (*Id.* at pp. 1152-1161.) Such evidence constitutes character evidence that tends to show that the defendant did not commit the charged crime. (*Id.* at pp. 1154-1155.)

has no interest in juvenile or pre-juvenile females; and (7) Legler's actuarial profile falls in the low to zero danger area. In the final section of the report, Dr. Brady notes "Legler did inappropriately touch the victim . . . , as he told the Police Officer Trung [*sic*]." However, Dr. Brady then indicated "[i]t is quite possible that at the time . . . Legler touched this minor he was in fact in between sleep and a wakeful state; thus, he momentarily was mentally confused."

When Patrick Riggs took over Legler's defense in November 2011, prior to the preliminary examination and trial, Weese transferred all his files, including Dr. Brady's report, to Riggs. However, neither Dr. Brady, nor any other *Stoll* expert, testified at trial. After Legler was convicted, Riggs faxed a copy of Dr. Brady's report to the probation officer.

In his supporting declaration, Riggs stated one of the challenges of representing Legler was "the fact that [Legler] had made certain admissions in a 'pre text' phone call, made to him by the complaining witness doe(s) in the case. [¶] In addition[, Legler] also made what could be construed as a confession . . . to the investigating officers in the case." Riggs believed he had to minimize these "admissions and confessions" in representing Legler.

Riggs believed the report from Dr. Brady "underscored the admission and confession themes as . . . Legler had related to the doctor that he had touched the doe victims." If he called Dr. Brady, the entire report would have to be produced, "allow[ing] the jury to know of repeated admissions and confessions especially to our potential expert, creating an absurdity."

Riggs instead decided to call Dr. Li to testify on Legler's behalf because Dr. Li "had a very close working relationship with [Legler] and was in a position to offer character evidence pursuant to Evidence Code [section] 1102 for both good moral character and character evidence of lay opinion that [Legler] did not have a sexual attraction to young girls." This character witness was preferable to Dr. Brady since Dr.

Li did not have knowledge of "confession or admission issues." Riggs discussed this tactic with Legler before trial and got his approval to follow this tactic.

In his supporting declaration, Legler disagrees with this last point, stating that Riggs "did not discuss Dr. Li's testimony as substituting for the testimony of Dr. Brady." Legler does not recall Riggs ever discussing the possibility of having Dr. Brady testify at all.

Appellate counsel called Riggs and asked whether he had considered calling a *Stoll* expert to testify. Riggs did not initially know what a *Stoll* expert was, but once the nature of such experts was explained to him, he stated that he had heard of them. Regardless, he believed the testimony from Dr. Li would be more persuasive than a *Stoll* expert since Dr. Li personally knew Legler and could testify regarding his good moral character.

After Legler was convicted, Riggs faxed over a copy of Dr. Brady's report to the probation officer prior to sentencing. Additionally, prior to sentencing, the trial court ordered that Legler undergo an examination pursuant to section 288.1; Dr. C. Mark Patterson performed the exam, and relying on Dr. Brady's previously issued report, concluded "that [Legler] does not pose a substantial risk of future sexual offending," and "[t]here is no evidence from this evaluation that either of his stepdaughters would be threatened with physical harm if imprisonment were not imposed."

### b. Counsel was not ineffective for not calling Dr. Brady

Legler argues there is no reasonable tactical explanation for failing to call Dr. Brady as a *Stoll* expert. Dr. Brady's report indicated that his character was not consistent with that of a pedophilic offender, and reasonably competent trial counsel would have called him to testify, regardless of whether Dr. Li was also testifying. The expected testimonies of the two individuals were completely different, and the testimony of one had no overlap with, or relationship to, the testimony of the other. Dr. Brady could have provided expert psychological testimony regarding Legler's lack of pedophilic

22

tendencies, which would have supported the defense theory that Legler had not consciously committed the alleged act.

We disagree. It was a reasonable tactical decision not to call Dr. Brady to testify on Legler's behalf at trial. In both the pretext phone call and in his interview with Detective Truong, Legler admitted touching the younger stepdaughter, but only being aware of touching pubic hair, at which point he withdrew his hand from her underwear. When pressed about touching her vagina, Legler admits it is possible he did so, but claims he did not do so consciously if at all. In his report, Dr. Brady notes that Legler "did inappropriately touch the victim." Dr. Brady would certainly be cross-examined on this or any other language in his report which would act to reinforce Legler's admissions, qualified as they may be, to the jury.

Though appellate counsel makes much of the contention that Riggs was unfamiliar with the term *Stoll* expert when appellate counsel first contacted him, we do not think this claim has much credence. One of the motions in limine prepared by Riggs prior to trial discusses the *Stoll* opinion and notes that it permits the introduction of expert testimony on a defendant's character in the context of a molestation case. Riggs was not, as appellate counsel suggests, ignorant of *Stoll* or its holding. He simply made a tactical decision not to call Dr. Brady, a witness who could testify that Legler did not have a deviant sexual character, but who would also testify that Legler admitted inappropriately touching the younger stepdaughter.

Accordingly, there is no basis for Legler's claim of ineffective assistance of counsel for failure to call Dr. Brady as a witness.

> 2. *Denial of request for funds to retain a sleep disorders expert violated constitutional rights to effective assistance of counsel and due process*

Legler's second contention in his petition for writ of habeas corpus is that he was denied effective assistance of counsel due to his trial counsel's failure to consult with and

23

call a sleep disorders expert to testify. He also contends that this court's denial of his application for $3,000 in fees to consult with a sleep disorders expert has deprived him of his constitutional right to effective assistance of counsel.

In general, defense counsel has the obligation to investigate possible defenses or make reasonable tactical decisions that render such investigation unnecessary. (*Strickland*, *supra*, 466 U.S. at pp. 690-691; *In re Hill* (2011) 198 Cal.App.4th 1008, 1016-1017.) "To establish that investigative omissions were constitutionally ineffective assistance, defendant must show at the outset that 'counsel knew or should have known' further investigation might turn up materially favorable evidence. [Citation.] [¶] Criminal trial counsel has no blanket obligation to investigate possible 'mental' defenses, even in a capital case. [Citations.] All our cases finding culpably deficient investigation of diminished capacity have involved initial facts *known to counsel* from which he reasonably should have suspected that a meritorious defense was available." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1244.)

In his declaration, appellate counsel states that he spoke to Riggs who told him Legler informed him prior to trial he believed he may have a sleep disorder, though he had never been officially diagnosed with one. Riggs further told appellate counsel he spoke with one of his colleagues and made a tactical decision not to call a sleep disorders expert to testify at trial because he believed the unconsciousness jury instruction was sufficient to present the defense theory, i.e., that Legler was unconscious at the time of the offense, to the jury. Riggs did not tell appellate counsel he ever consulted with a sleep disorders expert before deciding not to call one to testify.

In his supporting declaration, Riggs does not mention being told by Legler of this sleep disorder at any point in time, let alone prior to trial, nor does he mention discussing with his colleague whether to consult a sleep disorders expert. Legler's declaration also does not state that he had such any conversation with Riggs about a sleep disorder.

24

Upon being appointed to represent Legler on appeal, appellate counsel researched potential sleep disorders experts. Dr. Rafael Pelayo, M.D., an associate professor at Stanford University School of Medicine and a staff physician at the Stanford Sleep Disorders Clinic, was willing to serve as an expert witness for a petition for writ of habeas corpus. In his declaration, appellate counsel says Dr. Pelayo told him individuals can commit actions unknowingly in their sleep, a condition known as parasomnia.

Based on the preliminary information provided by Dr. Pelayo, appellate counsel filed a motion with this court for $3,000 to retain Dr. Pelayo as an expert witness. This court denied the motion and no sleep disorders expert was retained.

Here, there is a reasonable explanation why trial counsel failed to consult with or retain a sleep disorders expert; trial counsel had no reason to know that one might be necessary. There is no admissible evidence that Riggs was ever put on notice that a sleep disorder was a viable avenue of investigation. There is no mention of a possible sleep disorder in Dr. Brady's report, nor does Dr. Brady indicate that Legler mentioned such a disorder at any point during the evaluation. Appellate counsel's declaration about what Riggs said that Legler told him is hearsay.

In his declaration, Riggs stated that as he was preparing the case, he "reviewed the reports and interviewed [Legler] about his claim that he was asleep during the allegation relating to one of the does." Riggs believed there was conflicting evidence whether petitioner was "asleep or awake during the commission of that allegation." Accordingly, he "staff[ed] the fact pattern regarding the issue with an attorney who had extensive experience with the issue in the context of molestation cases. After this consultation[,] [Riggs] decided that the best tactical approach for a *credible presentation* to a jury was to marshal the evidence before [him]." At Riggs' behest, the trial court instructed the jury on unconscious acts, and Riggs believed that his closing argument outlined his approach that "[i]f the jury found that [Legler] was asleep or unconsciousness [*sic*], then they should factor the Unconscious Act instruction into their decision for acquittal."

25

Riggs was under no obligation to investigate Legler's supposed sleep disorder if he was never told about it. The only evidence presented was that Legler would sometimes fall asleep on the couch after a long day at work. That does not seem to describe a disorder, rather it describes a normal physiological occurrence and one within the common experience of most, if not all, jurors. At no time during the investigation of this case or during the trial did Legler relate anything that might be described as a sleep disorder, i.e., where he fell asleep and, while still asleep, did something that would normally be done by a conscious person, e.g., walking, driving, talking, eating, fondling someone's genitals, etc.

Because there is no evidence that Riggs was made aware that Legler claimed to have a sleep disorder, there was no basis for him to investigate that issue and explore it as a possible defense. For the same reason, Legler's right to effective assistance of counsel was not infringed by our denial of his request for fees to consult with a sleep disorders expert.

**III.    DISPOSITION**

The judgment and order are affirmed.  The petition for writ of habeas corpus is denied.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Elia, J.